**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| NEXIEN, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>SUNG WOOK KIM a/k/a "PAUL KIM",<br>GWANGWON KIM a/k/a "KEVIN KIM",<br>CHERIN LIM COREY, UIBS USA LLC,<br>ARCHIPLAN DESIGN GROUP, INC., and<br>FITTS & GOODWIN, INC.<br>                    Defendants. | Case No. :<br><br><br>**COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

The plaintiff NEXIEN, INC. ("Nexien"), by and through its undersigned attorneys, and by way of Complaint against the defendants SUNG WOOK KIM a/k/a "PAUL KIM", GWANGWON KIM a/k/a "KEVIN KIM", CHERIN LIM COREY, UIBS USA, LLC, ARCHIPLAN DESIGN GROUP, INC., and FITTS & GOODWIN, Inc., hereby states as follows:

**Preliminary Statement**

1.      This matter arises from the intentional acts of Sung Wook Kim a/k/a Paul Kim and Gwangwon Kim a/k/a Kevin Kim who are now the subject of a criminal investigation and prosecution.

**The Parties**

2.      Plaintiff Nexien, Inc. ("Nexien") is a full-service labor contracting company established under the laws of the State of New Jersey with a principal place of business and headquarters in New Jersey.

3.      Defendant Sung Wook Kim a/k/a Paul Kim ("PK") is an individual and South Carolina domiciliary.

4.     Defendant Gwangwon Kim a/k/a Kevin Kim ("KK") is an individual and South Carolina domiciliary.

5.     Defendant Cherin Lim Corey ("CL") is an individual and South Carolina domiciliary.

6.     Defendant UIBS USA LLC ("UIBS") is established under the laws of the State of South Carolina with a principal place of business in South Carolina. UIBS purports to provide human resources, manufacturing operations, industrial/commercial construction management, building management system, and building automation system services, amongst others. PK, KK, and CL are purported founders of UIBS.

7.     Defendant Archiplan Design Group, Inc. ("Archiplan") is established under the laws of the State of Georgia with a principal place of business in Georgia. Archiplan purportedly provides professional architecture-related services.

8.     Defendant Fitts & Goodwin, Inc. ("F&G") is established under the laws of the State of South Carolina with a principal place of business in South Carolina. F&G is a(n) (industrial) general contractor.

**Jurisdiction and Venue**

9.     This Court has jurisdiction over the matters alleged herein pursuant to 28 U.S.C. § 1332. Complete diversity exists between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.  This Court also has federal question jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

10.     This Court has jurisdiction over the Defendants because they are authorized to and/or are doing business in the State of South Carolina and/or have committed tortious acts within the State of South Carolina.

11.    Venue is proper in this District and this Division because a substantial portion of the events complained of occurred within this District and Division and one or more of the Defendants resides in Lexington County, South Carolina, which is within this Division.

### Facts Common to All Counts

12.    Nexien operates in the staffing solutions and operations management industries, providing labor forces to its clients, and other services accomplished through manual labor including but not limited to construction, renovation, and management of production plants.

13.    In connection with its business, Nexien hires hundreds of employees for manual labor and/or administration to be dispatched to Nexien's client-sites or to be dispatched to service locations.

14.    In the normal course of business, Nexien makes an initial investment to procure suitable work sites, pays wages to its employees, and pays for additional expenses, expecting to rely on accounts receivable to recoup the initial (capital) investment and eventually for profit.

### Paul Kim's Employment with Nexien

15.     PK was hired in May 2016, less than a year after Nexien was incorporated, as an assistant manager.

16.    At the time, PK represented on his employment application that he is a graduate of Columbia University, and has a Bachelor's degree in physics along with a Master's degree in mathematics. Exhibit 19.

17.    At least initially, PK presented himself as a trustworthy and capable employee.

18.     By April of 2018, PK was promoted to the position of business development director in South Carolina, also with the title of SEHA Unit Lead.[1]

19.     PK's responsibilities included procuring new contracts for Nexien from potential clients, including affiliates of Samsung.

20.     PK's responsibilities also included negotiating and executing service contracts; managing the execution and implementation of the services the client contracts for, including site preparation, site management, operations management, and providing a labor force; and reporting the status thereof to Nexien's headquarters in New Jersey ("HQ").

21.     Such site preparation includes executing necessary paperwork and contracts to secure the project site, hiring contractors for construction/renovation, and directing the work of Nexien's employees and contractors as necessary to provide the services to Nexien's clients.

22.     In this role, PK was the only employee of Nexien in direct communication with many of Nexien's clients[2], including Samsung and its affiliated entities.

23.     PK was tasked with relaying all communications of Nexien-clients under his purview to the HQ, including client's demands and preferences, so that Nexien may provide the appropriate services, including by dispatching or hiring qualified individuals for the tasks requested.

24.     In accordance with Nexien's practices, PK would submit weekly reports to HQ and attend weekly conferences/meetings to supplement his reports.

---

[1] Samsung Electronics Household Appliances ("SEHA") was one of Nexien's largest customer in South Carolina and PK was entrusted with all authorities relating to Nexien's transactions with SEHA.
[2] Also known as the "point of contact" in industry parlance.

25.     Based on the information provided by PK, HQ would then respond accordingly, mobilizing its workforce to prepare for projects, even securing additional labor forces when necessary, to ensure that clients receive optimal services.

26.     Due to PK's position as the point of contact for many of these clients and potential-clients, HQ had to, and did, rely on PK's representations concerning the contracts and services requested by the clients and potential clients.

### The SEHA "Contract"

27.     Since May 2018, Nexien had an agreement with Samsung's first U.S.-based home appliance manufacturing facility, Samsung Electronics Home Appliance ("SEHA"), in Newberry County, South Carolina to provide staffing services at the SEHA plant, whereby Nexien would dispatch laborers and/or production workers.

28.     Under this contract, Nexien has no responsibility for quality control or operations management.

29.     On or about September 10, 2019, PK represented that SEHA was looking to outsource its plant operations[3] entirely.

30.     PK further represented SEHA would retain Nexien to provide labor employees and supervisory employees.

31.     In further support of his representation, PK provided Nexien with an email attachment stating, in sum and substance, that the attachment is Samsung's internal report (a spreadsheet appearing to analyze the economic feasibility of the business process outsourcing ("BPO")). Exhibit 1.

---

[3] Also known as "business process outsourcing" or "BPO" in industry parlance.

32.    On or about September 11, 2019, PK sent Nexien a report based upon the purported Samsung internal report projecting Nexien's profit for the BPO contract reflecting monthly profits upwards of $800,000 each month. Exhibit 2.

33.    On or about September 24, 2019, PK sent Nexien a PowerPoint® slideshow with suggestions on the qualifications of employees to hire to meet the BPO project requirements. Exhibit 3.

34.    PK specifically represented that experienced professional employees must be hired for the tasks undertaken through the BPO contract.

35.    On or about October 7, 2019, PK represented Samsung required Nexien to provide a report to SEHA concerning the project.

36.    Based on Paul's representations, Nexien prepared such reports to be submitted to SEHA in a bid for the BPO service project.

37.    On or about November 8, 2019, Nexien paid PK a substantial bonus for his achievement in securing the BPO service project from SEHA.

38.    Through February 2020, PK continuously provided regular reports to Nexien concerning the SEHA bid, including providing and suggesting organizational structures for the BPO project and personnel assignments.

39.    PK also reported the status of negotiations with SEHA on pricing and terms of the contract to be executed and provided drafts of the anticipated contract as if he were negotiating and revising the contract terms with SEHA directly.

40.    On January 26, 2020, PK forwarded a purported email from SEHA's employee, Jihyun Son with the attached draft of the BPO service contract. Exhibit 4.

41.    Then, on February 14, 2020, PK sent Nexien what he purports to be a fully executed BPO contract (the "BPO Contract"), with PK signing on behalf of Nexien and "Austin Jeon" signing as the president of SEHA.

42.    In further support of his representation, PK provided an email purportedly from Ms. "Jihyun Son" of SEHA to PK stating "[a]attached is the fully executed agreement. Congratulations, and I look forward to working with you." Exhibit 5.

43.    Pursuant to the BPO Contract, Nexien would provide the laborers and general management services for SEHA. Specifically, Nexien was to provide services for the assembly, labeling, packaging, and storage of washing machines and dryers.

44.    In return, SEHA would pay Nexien an increased rate for the laborers' work hours and also administrative fees for the management of the plant operations.

45.    Notably, the BPO Contract provided very favorable terms that more than doubled the profit Nexien generated on each labor employee provided to SEHA in consideration of Nexien's assumption of additional responsibilities under the BPO, such as the efficient operation of the facility and related administrative functions.

46.    The BPO Contract presented to Nexien by PK bore the SAMSUNG watermark and stamps/bar codes to make the contract appear to have originated from Samsung.

47.    The BPO Contract reflected the terms PK reported were being negotiated for the past months.

48.    On or about April 20, 2020, Nexien began providing services to SEHA under the BPO Contract.

49.     To fulfill the requirements of the BPO Contract, Nexien hired experienced and highly compensated managerial employees in reliance upon and expecting SEHA to compensate Nexien for the administrative fees.

50.     Eager to provide optimal service to SEHA, and because Nexien's profit margin pursuant to the BPO Contract had increased, Nexien increased the hourly rates paid to laborers/production workers, hoping to increase productivity and quality of service.

51.     To meet SEHA's alleged needs as PK reported them, Nexien hired approximately 500 production workers and 20 managerial employees in addition to those already dispatched to SEHA's plant before signing the BPO Contract.

52.     PK sometimes provided Nexien with additional requirements and requests allegedly from SEHA based on his alleged meetings with SEHA representatives.

53.     One such requirement caused Nexien to make significant investments in procuring human resources management software called KRONOS and configuring it to meet SEHA's alleged requirements.

54.     PK represented to Nexien that SEHA required labor fees and administrative fees be invoiced separately, effectively separating the invoicing of the BPO Contract from the pre-existing contract.

55.     Nexien did as PK alleged SEHA required; invoices were to be delivered by and through PK.

56.     Despite their compliance, Nexien experienced continued hardship collecting on the BPO Contract invoices.

57.     On or about June 1, 2020, PK advised Nexien that SEHA is requesting a structural change to Nexien's invoices before processing. Exhibit 6.

58.     Nexien resolved all of SEHA's alleged concerns about invoicing (as PK reported them), but Nexien was not paid by SEHA for the administrative fees under the BPO Contract.

59.     Throughout Nexien's efforts to collect the accounts receivable from SEHA, PK repeatedly represented that he is in communication with Mr. Shim, the CFO of SEHA, regarding payments. PK even provided a falsified screenshot of Kakaotalk® messages with employees from Samsung's headquarters in Korea.

60.     On or about January 4, 2021, PK effectively admitted to Nexien that the project covered by the BPO Contract "does not exist" as far as SEHA was concerned, that the BPO Contract is a fake document, and that SEHA will not make any payment for the administrative fees incurred thereunder.

**The Construction Management Services Agreement**

61.     In or about February 2020, PK allegedly brought in another project from Samsung for construction management services.

62.     PK presented Nexien with a purported letter of intent signed by "Won Hee Kim", who appeared to be the president of Samsung Electronics Visual Display America ("SEVD"), affixed with a stamp purporting to show approval of the letter by SEHA's legal department. Exhibit 8.

63.     The letter of intent indicated that SEVD selected Nexien as the construction manager for a plant located in Maryville, Tennessee located at 1720 Robert C. Jackson Drive.

64.     The plant was and continues to be leased by (non-party) Denso, a Japanese automobile parts manufacturer, as an automobile parts manufacturing plant.

65.     PK represented that Samsung intended to take over Denso's plant and that construction and/or renovation would be performed upon the takeover.

66.     The letter of intent further indicates that a formal executed agreement would arrive in 30 days, but that SEVD requires Nexien to commence providing the services immediately and that "[a]ll costs incurred from March 2nd, 2020 will be paid by SEVD." Exhibit 8.

67.     Relying on this letter of intent, Nexien immediately mobilized its workforce and hired seventeen (17) experienced and highly compensated employees, providing them with benefits such as health insurance, housing (in a total of 14 apartments), and reimbursement for meals and travel costs.

68.     In further reliance on the purported letter of intent and relying on PK's representation that all costs incurred by Nexien would be covered by SEVD, Nexien procured a local office space at 245 South Washington Street, Maryville, TN 37804.

69.     Nexien later discovered that this letter of intent, too, was a fake document forged by PK.

70.     After hiring the employees to perform the tasks set forth in the letter of intent and as further reported by PK, PK represented the newly hired employees could not be put to the intended work due to internal issues with Samsung.

71.     PK represented to Nexien that the delays were due to Samsung's employees (dispatched from Korea to the United States) becoming infected with COVID-19, that the employees were hospitalized, and then ultimately that they had returned to Korea for health-related reasons.

72.     With these employees remaining on standby, PK represented to Nexien that SEVD required Nexien to devise several alternative plans concerning the anticipated plant renovations.

73.    While there was no work whatsoever to be done in Maryville, Tennessee, PK kept these newly hired and highly compensated employees "busy" by assigning them new but meaningless tasks from time to time.

74.    Upon information and belief, both the new tasks and the alternative plans allegedly demanded by Samsung were largely concerning PK's anticipated business venture, UIBS, and not in furtherance of Nexien's business.

75.    Ultimately, neither the construction/renovation referenced in the letter of intent nor Samsung's takeover of the plant came to fruition, and the contract referenced in the letter of intent never arrived.

76.    Throughout Nexien's involvement with this project based upon the purported letter of intent, Nexien invoiced SEVD through PK but was not paid for Nexien's work.

77.    PK continued to provide apparently legitimate reasons for the delays in SEVD's payment.

78.    To date, none of the invoices issued by Nexien to SEVD were paid, of course, because the letter of intent was forged by PK and SEVD was unknowledgeable about the project.

79.    As with the BPO Contract, on or about January 4, 2021, PK effectively admitted to Nexien that the project covered by the letter of intent "does not exist" as far as SEVD was concerned, that the letter of intent is a fake document, and that Nexien should not expect any payment for the services provided thereunder.

## Inbound Quality Control Agreement

80.    In or about November 2020, PK alleged he brought in another project from SEHA.

81.    The project concerned inbound quality control ("IQC") measures formerly undertaken internally by SEHA that PK represented would be outsourced to Nexien.

82.    In connection with this project, PK presented Nexien with a proposal purportedly prepared by PK and approved by Austin Jeon, the president of SEHA. Exhibit 9.

83.    The approved proposal concerned a warehouse to be procured by Nexien and specifications for construction/renovation.

84.    The proposal made it appear that PK had conducted substantial research and negotiations with real estate brokers to locate and lease a warehouse located at 267 Columbia Avenue, Chapin, South Carolina 29036.

85.    According to the proposal, purportedly to become a binding contract once approved by SEHA ("IQC Contract"), Nexien would invoice SEHA for all costs of leasing the warehouse and any construction (or renovation) work performed there.

86.    The IQC Contract also provided that if SEHA should cancel the project, SEHA would reimburse Nexien for "any termination fees, remaining lease fees, or other penalties required by Landlord[.]"

87.    PK also represented to Nexien that SEHA was operating under a very tight schedule, as supported by the contents of the purported approved proposal.

88.    In fact, the IQC project appeared to already be behind schedule and contained provisions that anticipated reviewing and signing the IQC Contract in October 2020, but the proposal was only approved in November 2020.

89.    As with any other project, Nexien immediately took action to lease the warehouse identified in the proposal and to hire a contractor and an architect for the construction/renovation work to provide optimal service to SEHA.

90.     In reliance on the purportedly approved proposal, on or about November 5, 2020, Nexien President Sam Kim, on behalf of Nexien, signed the lease agreement for the warehouse located at 267 Columbia Avenue, Chapin, South Carolina, 29036. Exhibit 10.

91.     The lease agreement is for a 24-month term at $32,300 per month base rent plus additional rent constituting common area charges and other items totaling $42,878.63 per month, along with a security deposit of $32,300.

92.     In addition to the lease agreement, Nexien also retained a general contractor, F&G, and the architect, Archiplan, on November 7, 2020 based on PK's representations and suggestions. Exhibit 11.

93.     Both F&G and Archiplan immediately began to perform the renovation and construction work contemplated in the purported IQC Contract.

94.     To date, F&G has requested payment of $476,254 from Nexien for the work F&G performed through December 2020. Archiplan did not approve the application for payment. Exhibit 12.

95.     Pursuant to the purported IQC Contract, SEHA is obligated to reimburse Nexien for the costs of renovation and construction.

96.     To better service SEHA pursuant to the anticipated IQC Contract, Nexien hired four (4) managerial employees to oversee, manage, and coordinate the procurement of the warehouse and the renovation work performed there.

97.     Nexien has received no reimbursement or payment whatsoever from SEHA for the costs incurred for this project.

98.     As with the BPO Contract and anticipated Construction Management Agreement/purported SEVD letter of intent, on or about January 4, 2021, PK effectively admitted

to Nexien that this project covered by the purported IQC Contract "does not exist" as far as SEHA was concerned, that the approved proposal is a fake document, and that Nexien should not expect any payment for the services provided thereunder.

### Paul Kim's False Reports, Continued Misrepresentations, and the Fallout

99.    Throughout each of the foregoing projects, Nexien experienced difficulty receiving payment under the invoices issued to SEHA and SEVD pursuant to the corresponding project/agreement.

100.    Nexien was not being paid for any services provided to SEHA, except for the labor fees charged under the BPO Contract, which, when invoiced separately from the administrative fees (as PK had directed Nexien to do) mimics fees payable by SEHA pursuant to the pre-existing contract with SEHA for simple staffing services.

101.    As capital investment into the purported projects with SEHA and SEVD continued to increase, Nexien's financial burdens increased along with it. However, anticipating the contractual returns on these investments, Nexien continued to invest and pump capital into the projects, even obtaining a $1.5 million line of credit from JP Morgan Chase to help bear the costs.

102.    Nexien's continued investment was reasonable, with reliance on the seemingly legitimate contracts with SEHA and SEVD, affiliates or subsidiaries of nationally renowned megacorporation, and their promise to pay, in addition to PK's repeated representation that payment is incoming.

103.    Throughout Nexien's attempts to be paid for their services rendered, PK represented/reported that he is in close contact with Mr. Naewon Shim, SEHA's CFO, and "Ben", SEHA's accounting employee, concerning payments due to Nexien. Exhibits 13-14.

104.    PK repeatedly reported that the payments were "on the way" or being "processed".

105.    Relying on PK's representations, Nexien continued to incur and pay costs, further investing in the purported agreements and projects.

106.    Notably, in October 2020, PK repeatedly reported that payment on the purported BPO Contract would be made within days.

107.    Thereafter, when payment was not received by Nexien, PK reported there were coordination/communication problems between Mr. Shim and "Ben" concerning payments to Nexien.

108.    When Nexien inquired as to the status of the payments and requested PK call Mr. Shim, PK repeatedly stated that he cannot contact Mr. Shim because Mr. Shim is on an airplane.

109.    By November 2020, Nexien was no longer capable of bearing further upfront costs for these purported projects.

110.    In December 2020, PK provided what he alleged to be screenshots of Kakaotalk messages between "Part Manager Ahn", "Deputy General Manager Park" (each of who allegedly works at Samsung's headquarters in Seoul, Korea), and PK, which indicated that payments were sent on December 29, 2020 and that Nexien should expect to receive the payment by January 5, 2021. Exhibit 15.

111.    Unsurprisingly, such payment was never received.

112.    Furthermore, upon further review, it became clear that the screenshots provided by PK were edited or doctored.

113.    Specifically, the screenshot purports a "Voice Call" among the three (Ahn, Park, and PK) that is 3 minutes 31 seconds in duration.

114.    However, voice calls initiated in a group chat on Kakaotalk® are displayed as "Group Call" and not "Voice Call".

115.    It also became apparent that the purported emails from Mr. Jihyun Son, forwarded to Nexien, were also edited or doctored.

**Nexien's Subsequent Investigations**

116.    On or about January 4, 2021, PK confessed that "[t]here is no money coming in because the TN [construction management service], IQC, and other projects do not exist for SEHA […] These projects do not exist and therefore there are no payments to be received" before going on to claim that no one embezzled money.

117.    Confronted with the totality of PK's fraud and the dire straits PK lead Nexien into, Nexien President Sam Kim begged PK for help and implored PK to think of the hundreds of employees that would be affected by the fallout.

118.    Apparently unperturbed and displaying shocking indifference to the livelihood and careers of his co-workers, PK responded in sum and substance, "I don't know what I can do for you. I am traveling with my family, but I will call you soon."[4] Exhibit 7.

119.    PK also represented that he is planning to start a business by obtaining funds from an investor, "Mr. Jung," and that he could help Nexien by sharing a portion of Mr. Jung's investment.

120.    After PK's confession, Nexien contacted SEHA seeking to verify the existence of the above-described projects and contracts and hoping that PK's confession was just some sick joke.

121.    It was not.

122.    Upon Nexien's inquiry, representatives of the Samsung subsidiaries indicated that no such project exists and that no such contracts were executed.

---

[4] This is based on the translation of the messages exchanged between PK and Sam Kim in Korean.

123.    Nexien's investigation also revealed that the signatures of Samsung's / SEHA's / SEVD's executives on each of the documents provided to Nexien by PK were all forged.

124.    Nexien also searched through PK's desk he used during his employment with Nexien and found a sheet of paper he used for practicing the forgery of SEVD's president. Exhibit 20.

125.    As part of their investigation, Nexien also ran a background check on PK and discovered he never obtained a Bachelor's or Master's degree from Columbia University and had falsified much of his employment application.

126.    For his contribution concerning these contracts, PK was awarded by Nexien in the form of career advancement and bonuses.

127.    To date, PK has not paid Nexien any money for remuneration or otherwise.

128.    Nexien's investigation additionally revealed that PK and his co-conspirators CL and KK were misusing and misappropriating Nexien's property and resources.

**Paul Kim's Attempt to Spoliate Evidence**

129.    Approximately a month before PK's confession that the contracts were forged, PK indicated to Nexien's information technology department that his email has been wiped.

130.    Together with the notice, PK inquired as to whether his email may be recovered.

131.    At the time, Nexien's IT department was unable to recover PK's emails and accordingly, advised PK that his emails cannot be recovered.

132.    Fortunately, upon a further attempt by Nexien's IT department to recover PK's emails after his shocking confession, Nexien was able to recover PK's emails.

133.    In reviewing PK's corporate email accounts, Nexien found no trace of emails from SEHA or SEVD concerning the contracts, as expected.

**Paul Kim's Co-Conspirators**

134.    In or about July 2020, PK and KK generated a falsified employment verification for CL and signed the same, indicating that CL is a data analyst at Nexien with a $41,600 annual salary. Exhibit 16.

135.    In or about November 2020, PK and KK generated another falsified employment verification stating that CL is a senior director of finance with a $150,000 annual salary and caused another Nexien employee, Ms. Tyson, to sign the falsified document.

136.    Ms. Tyson received an email from a mortgage company concerning the verification of employment form.

137.    Ms. Tyson inquired to KK about the request from the mortgage company.

138.    Ms. Tyson ultimately signed the fake Employment Verification at PK and KK direction, relying on their representations. Exhibit 17.

139.    CL is not and was never an employee of Nexien.

140.    Upon information and belief, CL is PK's wife or fiancé.

141.    Upon information and belief, the employment verification forms were used to commit fraud upon a mortgage company and/or in an auto insurance claim in furtherance of PK, CL, and KK obtaining financial benefit therefrom.

142.    Ms. Tyson immediately disclosed these facts upon PK's malfeasance being uncovered.

143.    Nexien's investigation further uncovered that PK and KK had doctored an offer letter purporting to originate from Facebook, Inc (the "Facebook Letter"). Exhibit 18.

144.    The Facebook Letter purports to be a firm offer of employment from Facebook, Inc. and purports that PK is the senior vice president of business development and partnership at Facebook, Inc.

145.    The Facebook Letter was uncovered during the investigation into PK's malfeasance and recovered from a Nexien email backup.

146.    Upon information and belief, the Facebook Letter was used in furtherance of fraud.

147.    Nexien's investigation also uncovered that on October 3, 2020, prior to PK's resignation, PK had registered a new company "UIBS USA LLC". Exhibit 21.

148.    UIBS's business registration lists CL as the registered agent.

149.    UIBS's website holds out PK as the president, CEO, and founder. KK is listed as the vice president of operations, and also as a founder. CL is listed as the vice president of finance, and also as a founder. See https://uibsusa.com/about; see also Exhibit 22.

150.    Upon information and belief, the doctored documents and resources fraudulently secured from Nexien were used to establish UIBS.

151.    UIBS's website holds UIBS out to be "experts in general corporate and manufacturing business matters including: ○ Human Resources ○ Manufacturing Operations ○ Equipment Engineering ○ Industrial/Commercial Construction Management, ○ Software Development, ○ Point of Sale, ○ Building Management System, ○ Building Automation System." Exhibit 23.

152.    These are the areas of Nexien's specialty; in other words, PK, KK, and CL used the resources fraudulently appropriated from Nexien to start a company as a direct competitor.

153.    KK left Nexien with PK when PK's malfeasance was uncovered.

154.    Defendants then began to poach Nexien's employees, sometimes by purporting to assign them to UIBS on behalf of Nexien.

155.    Defendants also stole Nexien property, including laptops, cell phones, and drug testing kits necessary in the industry to ensure laborers provided to clients are not taking illegal drugs.

156.    Despite Defendants insisting they had not stolen the property at issue, the property was ultimately surrendered by PK to law enforcement authorities in relation to a criminal investigation for which PK was arrested, arraigned, and indicted.

157.    Until being surrendered, the stolen property was being used by Defendants at and for the benefit of UIBS.

**FIRST CAUSE OF ACTION**
**Breach of Fiduciary Duty (Duty of Loyalty)**
**(as to Defendants Paul Kim and Kevin Kim only)**

158.    Plaintiff repeats and realleges the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

159.    Defendant Paul Kim was employed by Plaintiff for approximately 3 years and 8 months until his resignation in January 2021.

160.    Defendant Kevin Kim was employed by Plaintiff for approximately 2 years and 6 months until his resignation in January 2021.

161.    During the term of their employment, Defendants PK and KK had a fiduciary duty and duty of loyalty to act solely for the benefit of Plaintiff and not contrary to Plaintiff's interests with respect to all matters relating to or arising out of their employment relationship with Plaintiff.

162.    Since prior to their resignation, Defendants PK and KK breached their fiduciary duties by secretly preparing to organize and actually incorporating a business in direct competition with Plaintiff.

163.    During their employment, Defendants PK and KK depleted Plaintiff's resources to Plaintiff's detriment.

164.    During their employment, Defendants PK and KK caused Plaintiff to be financially crippled, so that their new business, UIBS USA, LLC, would have market share when it begins its operation.

165.    During their employment, Defendants misappropriated Plaintiff's confidential information, including those necessary to successfully set up a start-up company on their own.

166.    At their separation from employment with Plaintiff, Defendants PK and KK retained the property(ies) owned by Plaintiff and failed to return upon demand. Instead, Defendant PK falsely represented that he did not take possession of such property(ies).

167.    During and continuing after their separation from their employment with Plaintiff, Defendants PK and KK solicited other employees of Plaintiff and caused them to terminate their employment relationship with Plaintiff.

168.    As a proximate and direct result, Plaintiff has suffered pecuniary loss, harm, and/or damage, including without limitation, compensatory damages, wages paid to Defendants PK and KK, reputational and expectation damages.

## SECOND CAUSE OF ACTION
### Unfair Trade Practices and Competition
### (as to Defendants Paul Kim, Kevin Kim, Cherin Lim Corey, and UIBS)

169.    Plaintiff repeats and realleges the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

170.    Defendants PK and KK were long-time employees of Plaintiff.

171.    Defendant Cherin Lim Corey was in close contact with Defendants PK and KK and thereby obtained confidential and proprietary information relating to Plaintiff's business model, method, and strategy.

172.    Defendants PK, KK, and CL, using the confidential and proprietary information obtained from Plaintiff, founded a new business, UIBS USA, LLC.

173.    Prior to establishing their own business, Defendants PK and KK took the advantage of Plaintiff's trust in them as employees and caused financial loss to Plaintiff.

174.    Defendant PK made several misrepresentations, with intent to have Plaintiff rely on the same, regarding the profitability of Plaintiff's business in South Carolina and caused Plaintiff's clients to distrust and devalue Plaintiff's ability to provide competent services.

175.    As a result of the foregoing, Defendants PK, KK, and CL have effectively reduced the competitiveness of Plaintiff in the staffing solutions and labor contracting market and allowed themselves and their company, UIBS USA, LLC, to enter the market and generate profit.

176.    Defendants PK, KK, CL, and UIBS have engaged in a number of unfair trade practices as understood in the South Carolina Unfair Trade Practices Act, S.C. Code Sections 39-5-10 to 39-5-180, all as set forth in paragraphs 172-174 above.

177.    The Defendants' unfair trade practices have an adverse impact on the public interest and are capable of repetition.

178.    As a proximate and direct result, Plaintiff has suffered pecuniary loss, harm, and/or damage, including without limitation, compensatory, reputational, and expectation damages.

### THIRD CAUSE OF ACTION
**Tortious Interference with Business Opportunity and Economic Advantage**
**(as to Defendants Paul Kim, Kevin Kim, Cherin Lim Corey, and UIBS)**

179.    Plaintiff repeats and realleges all of the foregoing allegations as if set forth at length herein verbatim.

180.    Defendant PK was the point of contact for Plaintiff in communicating and conducting its business with its clients in South Carolina.

181.    As such, Defendant PK knew, or should have known, that Plaintiff had contracts for providing services to Plaintiff's clients in South Carolina, and that Plaintiff had a reasonable expectation of continued business relationship with such clients.

182.    As such, Defendant PK knew, or should have known, that Plaintiff had a reasonable expectation of business opportunity with other companies in South Carolina for staffing solutions and labor contracting services.

183.    By cohabitating with and/or frequently conversing with Defendant PK, Defendants KK and CL were also well aware of Plaintiff's reasonable expectation of continued business and potential business opportunity.

184.    Notwithstanding, Defendant PK, through coordination with Defendants KK and CL, established UIBS USA, LLC, which directly competed with, and reduced the market share of, and injured the prospective business opportunity of Plaintiff.

185.    Defendants' interference with Plaintiff's prospective business advantage and opportunity was wrongful because Defendants employed fraudulent means in causing said interference and also because Defendants breached their duty of loyalty and committed unfair competition in doing so.

186.    As a direct and proximate consequence of Defendants' wrongful acts, Plaintiff suffered compensatory, reputational and expectation damages.

**FOURTH CAUSE OF ACTION**
**Conversion/Trespass to Chattel/Replevin**
**(as to Defendants Paul Kim, Kevin Kim, and Cherin Lim Corey only)**

187.    Plaintiff repeats and realleges the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

188.    Defendants PK and KK destroyed and/or attempted to destroy documents and electronic files concerning Plaintiff's business, which were entrusted with Defendants PK and KK during their employment with Plaintiff.

189.    Defendants PK removed Plaintiff's properties, including laptops and other electronic devices from Plaintiff's business premises without Plaintiff's permission and failed to return said removed property upon demand by Plaintiff.

190.    Defendants PK, KK, and CL assisted one another in retaining and resisting the repossession of said property by Plaintiff.

191.    Defendants PK, KK, and CL wrongfully denied Plaintiff access and possession to property owned by Plaintiff.

192.    Defendants intentionally and willfully interfere with Plaintiff's possession of its property.

193.    Because of Defendants' tortious acts, Plaintiff no longer has possession or use of the property at issue.

194.    As a proximate and direct result, Plaintiff has suffered pecuniary loss, harm, and/or damage, including without limitation, compensatory, reputational and expectation damages.

195.    Plaintiff is entitled to the return of all properties in possession of Defendants, whether tangible or electronically stored, which belong to Plaintiff.

**FIFTH CAUSE OF ACTION**
**Misappropriation of Trade Secrets**
**(as to Defendants Paul Kim, Kevin Kim, Cherin Lim Corey, and UIBS)**

196.    Plaintiff repeats and realleges the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

197.    Plaintiff possesses trade secrets in the form of lists and contact persons for Plaintiff's clients and potential clients, as well as business strategies, models, and other industry-specific know-how.

198.    Defendants PK and KK were entrusted with said trade secrets in their capacity as employees of Plaintiff, to be used for the sole benefit of Plaintiff.

199.    In breach of their duty of loyalty, Defendants PK and KK took possession of said trade secrets for their personal benefit and used the same to establish UIBS USA, LLC.

200.    Furthermore, Defendants PK, KK, and CL used said trade secrets to promote and advertise their business and themselves as "experts" in the relevant field of business.

201.    Defendants PK, KK, and CL used and continues to use said trade secret to contact potential clients for UIBS USA, LLC and to secure contracts for services and thereby generate profits to Plaintiff's detriment.

202.    As a direct and approximate result thereof, Plaintiff has suffered damage, loss, and/or control.

**SIXTH CAUSE OF ACTION**
**Fraud / Negligent Misrepresentation**
**(as against Defendant Paul Kim)**

203.    Plaintiff repeats and realleges the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

204.    Defendant PK misrepresented to Plaintiff that several written agreements between Plaintiff and SEHA or SEVD were being negotiated and ultimately, that they were signed.

205.    As Plaintiff's trusted employee, Defendant PK had a duty to communicate truthful information to Plaintiff.

206.    Defendant PK's misrepresentations were false.

207.    Defendant PK knew or should have known that his misrepresentations were false.

208.    Defendant PK intended to have Plaintiff rely on his misrepresentation.

209.    Defendant PK was the point of contact for all clients of Plaintiff in South Carolina.

210.    Defendant PK provided written agreements purportedly being negotiated with Plaintiff's clients.

211.    Defendant PK provided emails which he purportedly received from Plaintiff's clients.

212.    Defendant PK provided executed copies of the purported contracts, with forged signatures of the presidents of Plaintiff's corporate clients.

213.    Based on all the emails and documents provided by Defendant PK, Plaintiff reasonably, justifiably, and rightfully relied on Defendant PK's misrepresentations.

214.    Defendant PK had, and is now realizing, pecuniary interest arising from Plaintiff's reliance on his misrepresentations in the form of business opportunity for his and Defendants KK and CL's new business, UIBS USA, LLC.

215.    As a result of reliance on Defendant PK's misrepresentations, Plaintiff suffered compensatory, reputational, and incidental damages.

216.    As a result of reliance on Defendant PK's misrepresentations, Plaintiff contracted with several real estate holding companies to provide lodging for its employees, leased a warehouse, contracted with an architect and contractor to renovate said warehouse, paid for meal and travel for its employees, increased hundreds of its employees' wages, and hired tens of highly compensated professional employees, and incurred cost in paying their wages.

## SEVENTH CAUSE OF ACTION
### Declaratory Judgment Pursuant to 28 U.S.C. § 2201
### (as against Defendants Paul Kim and UIBS)

217.    Plaintiff repeats and realleges the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

218.    Defendant PK has committed fraud and forgery and induced Plaintiff to enter into contracts with various entities, including real estate holding companies, an architect, and a contractor.

219.    Plaintiff was charged and sent invoices for the services provided by these entities, for which Plaintiff disputes and denies liability.

220.    These charges were made against Plaintiff due to Defendant PK's fraudulent and deceitful act alleged herein.

221.    All of Plaintiff's fraudulent and deceitful acts were committed in furtherance of UIBS USA, LLC's business.

222.    There exists an actual controversy as to Plaintiff's purported responsibility for these invoices and bills, and to the extent the third parties seek payment from Plaintiff, Plaintiff has

claims against Defendant Paul Kim for the full indemnification of all financial and other obligations.

223.    Based on the foregoing, Plaintiff is entitled to a declaratory judgment that Defendant Paul Kim and UIBS USA, LLC shall be fully liable for all claims which may be asserted against Plaintiff by the real estate holding companies, architect, and contractor.

## EIGHTH CAUSE OF ACTION
### Declaratory Judgment Pursuant to 28 U.S.C. § 2201
### (as against Defendants Archiplan, F&G, Paul Kim, and UIBS)

224.    Plaintiff repeats and realleges the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

225.    In reasonable, justifiable, and rightful reliance on Defendant PK's misrepresentation, Plaintiff entered into a contract with Archiplan and F&G.

226.    Pursuant to the contract, Archiplan and F&G would provide construction-related services and Plaintiff would make payment in return if Plaintiff were first paid by SEHA.

227.    Plaintiff was not paid by SEHA for any of the services provided by Archiplan and F&G.

228.    Defendant PK fraudulently induced Plaintiff to enter into the construction contract.

229.    Based on the foregoing, Plaintiff is entitled to a declaratory judgment that Plaintiff is not liable for any charges made by Archiplan or F&G, or in the alternative, that Defendants PK and UIBS USA, LLC are liable for said charges.

## NINTH CAUSE OF ACTION
### Conspiracy
### (as against all Defendants except Archiplan and F&G)

230.    Plaintiff repeats and realleges the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

231.    Defendants PK and CL are, upon information and belief, a married or engaged couple.

232.    Defendants PK and KK were both employees of Plaintiff and have secretly gathered and exchanged the trade secrets and other proprietary information of Plaintiff.

233.    Defendants PK, KK, and CL maintain a close relationship, that Defendants PK and KK would forge documents for the benefit of CL in obtaining insurance benefits and in obtaining a mortgage loan.

234.    Defendants PK, KK, and CL reached an agreement and collectively devised a plan to defraud Plaintiff into signing various falsified contracts, inducing Plaintiff to incur unbearable expenses and to cause Plaintiff to become insolvent and cease operation, resulting in special damage to Plaintiff.

235.    In furtherance of their plan, Defendants PK, KK, and CL each took affirmative steps in founding UIBS USA, LLC.

236.    As a proximate result of Defendants PK, KK, CL, and UIBS's agreement and performance thereof, Plaintiff suffered economic and reputational damages.

### TENTH CAUSE OF ACTION
**Aiding and Abetting**
**(as against all Defendants except Archiplan and F&G)**

237.    Plaintiff repeats and realleges the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

238.    Defendant PK has caused an injury to Plaintiff by way of breaching his fiduciary duty of loyalty, by committing fraud upon Plaintiff by presenting several fraudulent and forged documents, and by founding UIBS USA, LLC and unfairly competing with Plaintiff.

239.    Defendant KK has aided Defendant PK by way of assisting Defendant PK in breaching his fiduciary duty of loyalty and in generating fraudulent documents.

240.    Defendant KK has caused an injury to Plaintiff by way of breaching his fiduciary duty and by founding UIBS USA, LLC and unfairly competing with Plaintiff.

241.    Defendant CL has aided Defendants PK and KK by assisting them in founding UIBS USA, LLC and unfairly competing with Plaintiff.

242.    Defendants PK, KK, CL, and UIBS, were knowledgeable of, and at least generally aware of, their participation in the unlawful acts performed by Defendants PK and KK.

243.    As a proximate result of the unlawful acts by Defendants PK and KK, and Defendants PK, KK, CL, and UIBS's aiding and abetting thereof, Plaintiff suffered an injury, including but not limited to compensatory, reputational, and expectation damages.

## ELEVENTH CAUSE OF ACTION
### Injunction
**(as against Defendants Paul Kim, Kevin Kim, Cherin Lim Corey, and UIBS)**

244.    Plaintiff repeats and realleges the allegations of all preceding paragraphs as though fully set forth at length herein verbatim.

245.    Defendants PK, KK, and CL have founded UIBS USA, LLC and now directly competes with Plaintiff, which now operates with the reputational damage caused by Defendants.

246.    The causes of actions alleged herein, including unfair competition, fraud, and conversion are meritorious and Plaintiff has a probably right to the relief sought.

247.    The probability of success on the merits of said claims is buttressed by the pending criminal investigation and indictment of Defendant PK, currently undertaken by the U.S. Secret Services.

248.    Should Plaintiff lose its market share and profit and/or become insolvent, Plaintiff will have suffered an irreparable injury.

249.    The threat of such irreparable harm is imminent and probable, as Plaintiff has already suffered, is currently suffering, and will continue to suffer such harm if an injunction is denied.

250.    For the foregoing reasons, Plaintiff is entitled to a permanent injunctive relief as well as a temporary injunctive relief, as may be requesting during the pendency of this action.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff Nexien, Inc. seeks judgment against Defendants Paul Kim, Kevin Kim, Cherin Lim Corey, UIBS, Archiplan, and F&G as follows:

a)    awarding an amount to be determined at trial on the first cause of action;

b)    awarding an amount to be determined at trial on the second cause of action;

c)    awarding an amount to be determined at trial on the third cause of action;

d)    awarding an amount to be determined at trial on the fourth cause of action;

e)    awarding an amount to be determined at trial on the fifth cause of action;

f)    awarding an amount to be determined at trial on the sixth cause of action;

g)    awarding an amount to be determined at trial on the seventh cause of action;

h)    awarding an amount to be determined at trial on the eighth cause of action;

i)    awarding an amount to be determined at trial on the ninth cause of action;

j)    awarding an amount to be determined at trial on the tenth cause of action;

k)    ordering Defendant PK to disgorge all wages, bonuses, and value of other employment benefits provided to him during his employment with Plaintiff;

l)      ordering Defendant KK to disgorge all wages, bonuses, and value of other employment benefits provided to him during his employment with Plaintiff;

m)      ordering Defendant PK to return all property(ies) owned by Plaintiff to Plaintiff;

n)      ordering Defendant PK to return all property(ies) owned by Plaintiff to Plaintiff;

o)      awarding judgment against Defendants PK, KK, CL, and UIBS, jointly and severally, in an amount not less than $3,000,000 for compensatory damages, reputational damages, and expectation damages.

p)      declaring that Defendants PK and UIBS shall be liable for any claims or actions asserted against Plaintiff concerning, relating to, or arising out of the BPO Contract, Tennessee construction management project, and the IQC Contract.

q)      declaring that Plaintiff is not liable for making payment to Archiplan and Fitts & Goodwin; or in the alternative, awarding Plaintiff not less than $42,000 against Archiplan and not less than $476,254 against Fitts & Goodwin;

r)      ordering Defendants PK, KK, CL, and UIBS to cease operation of its staffing solutions business and to cease competing with Plaintiff in all respect in South Carolina.

s)      ordering Defendants be enjoined from using any Nexien-derived information in furtherance of UIBS's or any other of the individuals' business(es).

t)      awarding Plaintiff's reasonable attorneys' fees (to the extent allowed by law), other litigation expenses and costs of suit; and

u)      for such other, further or different relief as the Court may deem equitable, just and fair.

Dated: April 6, 2021

HURLEY LAW PA


*s/Sarah Day Hurley*
Sarah Day Hurley (Fed Id No. 7267)
15 South Main Street, Suite 501
Greenville, SC 29601
(864) 775-5870
shurley@hurleylawsc.com


Joshua S. Lim
John Chen
Seokchan (Sean) Kwak
Kim, Cho & Lim, LLC
460 Bergen Boulevard, Suite 305
Palisades Park, New Jersey 07650

*Attorneys for Plaintiff*